IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | NO. 09-74-01 |
| JONATHAN BATTLES | : | |

MEMORANDUM OPINION AND ORDER

**Rufe, J.**                                                                                                                 **January 10, 2012**

      After a three-day trial, a jury convicted Defendant Jonathan Battles of one count of conspiracy to commit bank fraud in violation of 18 U.S.C. § 371 and one count of bank fraud in violation of 18 U.S.C. § 1344. Battles filed post-trial motions challenging the verdict, and requested several continuances to allow for investigation, additional briefing, and to present evidence to the Court.[1] At this time, Battles asserts one basis for relief: that DVD recordings of police interviews of Angelique Torres, a co-conspirator who served as the Government's principal witness, were withheld in violation of <u>Brady v. Maryland</u>.[2] The Court has reviewed the trial transcripts, the parties' written submissions, the DVD recordings, and has held hearings at which the parties had the opportunity to present evidence. For the following reasons, the motions will be denied.

---

      [1] After the initial motion was filed, Defendant obtained new counsel, who filed supplemental motions and briefs with this Court, and represented Battles in all post-verdict proceedings, including the hearings. Battles has sought various forms of relief, including dismissal of the indictment with prejudice and a new trial. Some of the claims for relief were withdrawn.

      [2] 373 U.S. 83 (1963).

# I. BACKGROUND

### A.  *The Conspiracy*

On February 5, 2009, Battles and co-defendants Angelique Torres and Tamika Booker were indicted for bank fraud and conspiracy to commit bank fraud.[3]  Battles was charged with conspiracy to defraud Commerce Bank and JP Morgan Chase Bank by stealing checks written on the JP Morgan account of the City of Arlington, Texas, and depositing these stolen checks into accounts at Commerce Bank in Philadelphia.

The evidence at trial, viewed in the light most favorable to the Government, showed that Battles led the conspiracy from Philadelphia.  Battles had a romantic relationship with Torres, and he was aware that Torres, an Arlington employee, had access to checks written by Arlington on accounts maintained at JP Morgan and payable to individuals and vendors providing services to Arlington.  Between February 2, 2007, and July 2, 2007, Battles instructed Torres to steal checks and send them to him in Philadelphia.  Battles then gave the stolen checks to Booker, who deposited them in bank accounts she had opened in Philadelphia. When the scheme was discovered, Arlington police detectives questioned Torres about the missing checks, and she eventually implicated Battles.  Pursuant to a cooperation plea agreement, she testified for the Government at trial.

### B.  *The Police Interviews of Torres*

Battles contends that the Government failed to turn over DVD recordings of three interviews of Torres conducted by Arlington police, and that its failure to do so constitutes a Brady violation.  Before trial, the Assistant United States Attorney ("AUSA") provided defense

---

[3] Both Torres and Booker pled guilty; only Battles proceeded to trial.

counsel with what he characterized as, and believed at the time was, his entire investigative file. Because the AUSA had no specific recollection of seeing or turning over any DVDs, he conceded to the Court for purposes of the motions that the DVDs had not been produced to the defense.[4]  Written summaries of two of the three interviews were produced, however, as part of the investigative file.

### 1. The December 19, 2007 Interview

The first DVD at issue in this case contains the initial interview of Torres, which was conducted by Arlington police detectives on December 19, 2007.  The AUSA received a copy of the DVD before trial, but defense counsel did not receive a copy until November 5, 2010, long after the trial concluded.[5]  Before trial the Government did produce to defense counsel a police report containing a summary of the interview.[6]  The summary noted that the interview was recorded: "The [December 19] interview of Torres was video taped and will be maintained by the Arlington Police Department for evidentiary purposes.  A copy of the interview will be made available to the [Tarrant County, Texas District Attorney's] office upon their request."[7]  Despite having this notice of the DVD's existence, defense counsel did not request a copy before trial.[8]

The police summary of the December 19 interview is detailed, describing how over the course of the interview, Torres contradicted herself, was evasive, and lied to detectives about

---

[4] Hr'g Tr. 4/20/11 at 32.

[5] Gov't Resp. to Def.'s Mot. for Continued Brady Hr'g at 5.

[6] Id. at 5. This police summary was admitted in the April 20, 2011 hearing as Exhibit G-1.

[7] Exh. G-1 at 6.

[8] Hr'g Tr. 11/2/10 at 29.

knowing Battles, her relationship with him, and the nature and extent of her interactions with him.[9] It reports that Torres initially gave a false name for an acquaintance in Philadelphia before eventually admitting that she knew Battles and that they had a relationship.[10]

The summary also describes how Torres lied about whether she knew about or was involved in the theft of checks, before eventually admitting that she had taken five checks. The summary notes that during the interview, Torres denied having any additional checks, but that a later search of Torres's home uncovered a total of eight municipal checks and two additional vendor checks.[11]

### 2. The January 18, 2008 Interview

A second recorded interview of Torres occurred on January 18, 2008. It appears that neither the DVD nor a summary of this interview was in the AUSA's possession before trial.[12] The AUSA and the case agent first learned of this DVD when it was attached to one of Battles's post-trial filings with this Court.[13] Defense counsel obtained this DVD directly from the police on her own initiative after Battles's trial.[14] During this interview, Torres was much more cooperative, and recanted much of what she had said in the December 19 interview.

---

[9] Exh. G-1.

[10] Exh. G-1.

[11] Exh. G-1 at 5-7.

[12] Hr'g Tr. 4/20/11 at 5.

[13] Hr'g Tr. 4/20/11 at 5.

[14] Hr'g Tr. 4/20/11 at 5-6. The record shows only that the DVD was obtained post-trial; it does not reveal the circumstances of its production.

4

### 3. The January 22, 2008 Interview

Torres's third and final interview with the Arlington police, on January 22, 2008, was also recorded on DVD. For purposes of the motions before it, the Court assumes that the AUSA received a copy of the DVD from the Arlington police before trial, but failed to produce it to Battles or his counsel.[15] As with the first interview, the AUSA produced to defense counsel a police report summarizing the interview before trial; unlike the summary of the first interview, this summary did not state that the interview had been recorded.[16] According to the summary, Torres acknowledged her relationship with Battles and involvement in the conspiracy during the interview.[17] She described her visits and communications with Battles during the conspiracy, and provided the email addresses by which they corresponded.[18] Torres stated that Battles told her that he did not want to correspond about the stolen checks by phone.[19] Torres also stated that she had telephoned Battles before the December 19 interview, and Battles told her what she should tell detectives.[20] She stated that Battles instructed her not to implicate him in the scheme[21] and stated that Battles instructed her to lie and say that she and Booker were friends and had met

---

[15] Hr'g Tr. 4/20/11 at 4-5.

[16] Gov't Resp. at 5. This police report was admitted into evidence during the Post-Trial Hearing on Brady issues as Exh. G-2.

[17] Exh. G-2 at 2-3.

[18] Id.

[19] Id.

[20] Id.

[21] Id.

online.[22]

Despite having the summary of the January 22 interview, and knowledge that one of Torres's prior interviews had been recorded, defense counsel did not inquire before trial whether the interview had been recorded.[23] Defense counsel received a copy of the interview DVD on November 5, 2010, after the trial.[24]

### C. The Evidence at Trial

#### 1. Torres's Testimony

At trial, Torres testified that she was working for Arlington as a payroll processor when she met Battles through a dating website.[25] She described their frequent telephone conversations and online correspondence.[26] Torres identified Battles's phone number, address, business name, and the instant messaging name with which she communicated with him.[27]

Torres testified that Battles expressed interest in starting a business, called AXXS, but lacked the necessary start-up capital.[28] She described how Battles began asking about her role as a payroll processor, whether she had access to checks, and whether she would be willing to steal

---

[22] Id. Torres denied knowing Booker.

[23] Hr'g Tr. 11/2/10 at 29.

[24] Gov't Resp. at 5.

[25] Notes of Trial Testimony ("N.T.") 5/4/10 at 4-5.

[26] N.T. 5/4/10 at 6-8.

[27] N.T. 5/4/10 at 7 (identifying Battles's telephone number); at 9 (identifying his business name); at 22 (identifying the address of that business, to which she sent checks); at 28-29 (discussing Exhibit 15, an online chat exchange between Booker and Battles).

[28] N.T. 5/4/10 at 9-10.

6

Arlington checks for him.[29] During direct examination, Torres described how she succumbed to Battles's repeated requests for checks, and admitted to stealing five payroll checks presented at trial for identification.[30]

Torres also testified that on December 19, 2007, Arlington police approached her at work and asked her to accompany them to the station for questioning.[31] As she drove to the station, she called Battles, who instructed her to lie to police about his name and his involvement in the crime.[32] Torres readily admitted on direct examination that she had lied to Arlington police about whether she had any information about the missing checks and about Battles's real name.[33] She testified that, after repeated questioning over the course of the investigation, and after being confronted with documents by Arlington detectives, she finally admitted Battles's real name, her relationship with him, and her role in stealing the checks.[34] Lastly, Torres testified that she had pled guilty to bank fraud and was testifying pursuant to a cooperation plea agreement in hopes of receiving a lighter sentence.[35]

---

[29] N.T. 5/4/10 at 10-11.

[30] N.T. 5/4/10 at 14-27 (discussing the checks during direct examination, marked as Exhibits 3, 4, 5, 6 and 2, confirming that she took each of them and either mailed or gave them to Defendant in person). See also N.T. 5/4/10 at 33-34 (discussing Exhibit 7, a compilation of stolen vendor checks that Torres admitted to stealing on direct examination, but which she testified were never given to Battles, but were instead discovered by police in her home).

[31] N.T. 5/4/10 at 36-37.

[32] N.T. 5/4/10 at 37-38 (testimony that Battles instructed her not to mention his name, but instead to call him by a fictional name, "Anthony Mendoza," and to delete his contact information and messages from her cellular telephone); N.T. 5/4/10 at 38 (testimony that Battles told her to lie and say she was friends online with Booker, when in reality Torres did not know Booker and had never been in contact with her or met her).

[33] N.T. 5/4/10 at 39-40.

[34] N.T. 5/4/10 at 40.

[35] N.T. 5/4/10 at 16-18 (discussing Exhibit 16, which was her cooperation plea agreement).

7

On cross-examination, defense counsel chose to challenge Torres's credibility by emphasizing discrepancies in her recollection of events and her dishonesty with police. Counsel did not try to elicit testimony that Battles was not part of the conspiracy.[36]

### 2. Corroborating Evidence

At trial, virtually every aspect of Torres's testimony was corroborated by documentary evidence and the testimony of other witnesses.[37] Special Agent Koerber of the United States Secret Service testified extensively about phone records that linked communications between Battles and Booker with dates on which stolen checks were deposited.[38] Agent Koerber also testified regarding airline records and Battles's cell phone roaming records, which match the

---

[36] Defense counsel appears to have made this strategic decision to avoid the risk that Battles's proffer, in which Battles purportedly admitted to his role in the conspiracy, would become admissible.

[37] See N.T. 5/4/10 at 140-59 (testimony by Special Agent Koerber as to phone, airline, roaming charge and text message records, confirming the timeline of the conspiracy described by Torres). See also Exh. 11 (American Airline records); Exh. 17 (roaming charge records of Battles's cell phone, which confirmed Torres's testimony about when he visited her in Texas); Exhs. 9 and 10 (summaries of phone records prepared by Agent Koerber); Exh. 18 (a phone record prepared by Agent Koerber and summarizing activity for Battles's telephone number on April 17, 2007, the date on which co-conspirator Booker deposited an Arlington check at Commerce Bank); Exh. 19 (a flowchart summary of phone calls between Battles and Booker and between Battles and Torres on April 17, 2007, the date the first stolen check was deposited, which confirms that Booker and Torres did not contact each other at all that day, as discussed by Agent Koerber on direct examination at 150:1-22); Exh. 20 (a summary of telephone calls involving the co-conspirators on April 19, 2007, which shows that Battles called Commerce Bank at 7:57 a.m. and Torres at 8:09 a.m.); Exhs. 23, 25, 26 (additional phone and text message records discussed by Agent Koerber on direct examination); N.T. 5/3/10 at 92-95 (testimony of investigator from TD Bank (successor to Commerce Bank) that a call from Battles's telephone number attempted to wire funds from Booker's personal bank account); N.T. 5/3/10 at 84-89 (TD Bank investigator's testimony as to the dates that all five checks were deposited). This evidence confirms Torres's direct examination testimony about the scope and duration of the conspiracy and general timeline during which checks were stolen and deposited.

[38] N.T. 5/4/10 at 146 (discussing Exhibit 18, depicting Battles's phone activity on April 17, 2007, a date on which one of the checks was deposited by Booker); N.T. 5/4/10 at 150 (discussing Exhibit 19, a chart of calls on April 17); N.T. 5/4/10 at 151 (discussing Exhibit 20, showing Battles made a call to the bank on April 19 to see if the check cleared in Booker's account); Exhs. 21, 23, 25, 26, 28, 29, 30 (showing Battles's phone records on days where checks were deposited by Booker); N.T. 5/4/10 at 156-57 (Agent Koerber's testimony explaining Exhibit 28, showing that Booker deposited a check at 4:58 p.m. and exchanged six text messages with Booker between 2:48 p.m. and 3:50 p.m.); N.T. 5/4/10 at 158-59 (Agent Koerber's testimony that the same day Booker opened a an account in the name of Stabile and Winn, the payee of one of the stolen vendor checks, at Commerce Bank, she deposited a check into it).

8

dates that Torres testified Battles visited her in Texas during the course of the conspiracy.[39]

Torres's testimony that she and Battles corresponded online about invoices was confirmed by Exhibit 15, which contained the text of one of those conversations, and by the testimony of Sharon Warnke, a witness who had a long-term relationship with Battles.[40] In addition, Warnke and another witness, Diane Misciagna, both confirmed Battles's cell phone number, allowing for corroboration of Torres's testimony about telephone contacts.[41]

Misciagna testified that she met Battles through the same online dating website on which Torres met Battles, and that he mentioned he wanted to start an adult entertainment business called AXXS.[42] Misciagna also confirmed Battles's Holland, Bucks County, Pennsylvania address, to which Torres testified she sent at least one check.[43] Torres's testimony about this address was also confirmed by an envelope made out to that address, which police found in her home.[44] Misciagna also testified that during her relationship with Battles, he told her of his friendship with Booker and Torres.[45]

---

[39] N.T. 5/4/10 at 140-42 (referring to Exhibit 17 and airline records).

[40] N.T. 5/4/10 at 118-20 (Warnke's testimony as to her discovery of an online chat (Exhibit 15) between Battles and Angie35 (Torres's online chat name), which Warnke turned over to detectives when she realized that Battles and Angie35 were probably the parties mentioned in a news article about the fraud scheme).

[41] N.T. 5/4/10 at 122 (testimony of Warnke, referring to Exhibit 10 and identifying Battles's phone number), N.T. 5/4/10 at 108 (testimony of Misciagna, referring to Exhibit 10 and identifying Battles's phone number).

[42] N.T. 5/4/10 at 105, 106.

[43] N.T. 5/4/10 at 3-10.

[44] N.T. 5/4/10 at 22 (discussing the label (Exh. 8)).

[45] N.T. 5/4/10 at 109-11.

The testimony of an investigative analyst for TD Bank (the successor entity to Commerce Bank) testified that Booker had opened two accounts at a Philadelphia bank branch, where Booker deposited the stolen checks.[46] Bank records confirmed that each check Torres testified she had stolen and given to Defendant was ultimately deposited by Booker into one of these bank accounts.[47] The bank analyst testified that bank records showed that Battles had attempted to access the account by phone and attempted to transfer funds two days after Booker had deposited a stolen check.[48]

## II. Legal Standard

Battles seeks to have the Court vacate the criminal judgment and to dismiss the indictment with prejudice, barring a retrial, based on claimed violations of the Government's obligations under Brady. The Third Circuit has held that "[w]hile retrial is normally the most severe sanction available for a Brady violation, where a defendant can show both willful misconduct by the government, and prejudice, dismissal may be proper."[49] The Court notes at the outset that there has been no evidence of deliberate misconduct or a reckless disregard of its duties under Brady by the Government in this case. Therefore, the only relief available to Battles would be a new trial pursuant to Federal Rule of Criminal Procedure 33, which provides that

---

[46] N.T. 5/3/10 at 84-99 (testimony that Booker opened a personal account, and also an account in the name of Stabile and Winn, the payee of one of the stolen vendor checks, and testimony regarding transactions related to that account and surveillance video of Booker in the bank).

[47] N.T. 5/3/10 at 82-86 (testimony of TD bank investigative analyst discussing Exhibit 1).

[48] N.T. 5/3/10 at 92-95.

[49] Gov't of the V.I. v. Fahie, 419 F.3d 249, 255 (3d Cir. 2005).

"[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."[50] The burden lies with the defendant to prove that a new trial should be granted,[51] and the decision to grant a motion for a new trial is committed to the sound discretion of the trial court.[52]

### III. DISCUSSION

In Brady, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution."[53] To constitute a Brady violation, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."[54]

Where, as here, the undisclosed evidence goes to the credibility of a witness, the Third Circuit has held that although "undisclosed Brady material that would have provided a *different* avenue of impeachment is material, even where the witness is otherwise impeached,"[55] "it is only

---

[50] Fed. R. Crim. P. 33(a).

[51] United States v. Sass, 59 F.3d 341, 350 (2d Cir. 1995); see also 3 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Criminal § 551 (3d ed. 2009).

[52] United States v. Daniels, No. 95-369, 1996 WL 311444, at *4 (E.D. Pa. June 6, 1996).

[53] 373 U.S. at 87.

[54] Strickler v. Greene, 527 U.S. 263, 281-82 (1999).

[55] United States v. Walker, 657 F.3d 160, 185 (3d Cir. 2011) (quoting Lambert v. Beard, 633 F.3d 126, 134 (3d Cir. 2011) (emphasis in Walker)).

those new avenues of impeachment that sufficiently undermine confidence in the verdict that will make out a successful Brady claim."[56] In this case, written summaries of two of the interviews were produced to Battles before trial. The summaries provided ample material with which the defense could challenge Torres's credibility, and Torres's lies and omissions were explored both in Torres's direct testimony and on cross-examination. Further, none of the DVDs was material in this case, and Battles was not prejudiced by not receiving the DVDs before trial.[57]

### A. The December 19, 2007 interview DVD was not material

Battles has not identified any avenues of impeachment revealed by the DVD of the December 19, 2007 interview that were not already apparent from the police summary. Battles has not established that the DVD itself was material, and has not explained why he failed to request the DVD when the summary made clear that the interview had been recorded and the recording maintained.[58] The Court has viewed the DVD and finds that the summary produced before trial fairly and accurately represents the contents of the interview with regard to possible material for impeachment.

---

[56] Id. at 188.

[57] To the extent that there is a claim that the failure to produce the DVDs violated the Jencks Act, 18 U.S.C. § 3500, the Court similarly finds that any alleged violation did not prejudice Battles. See United States v. Hill, 976 F.2d 132, 142 (3d Cir. 1992) ("When undisclosed Jencks material is merely repetitious and/or cumulative of evidence available to the defendant at trial, the Jencks error can be deemed harmless, especially where the undisclosed pretrial statements do not contain impeachment material that would add to an already effective cross-examination of a key witness.").

[58] Cf. United States v. Pellulo, 399 F.3d 197, 213 (3d Cir. 2005) (holding that Brady does not compel the government "to furnish a defendant with information which he already has, or which by any reasonable diligence, he can obtain himself").

### *B. The January 18, 2008 interview was not material*

Although neither a summary nor a copy of the DVD of the January 18, 2008 interview was produced before trial, Battles has not established a Brady violation. Battles argued that the interview revealed several issues that could have been explored during cross-examination, including that Torres admitted that she knew how to electronically access Booker's bank accounts by telephone, and that therefore Torres could have coordinated bank transfers with Booker, thus playing a greater role in the conspiracy than she acknowledged.[59] Battles also argued that Torres's credibility could have been challenged based on her interview statement that a Wal-Mart gift card was found in an envelope in her house, when in fact police found additional stolen checks in that envelope.[60] After viewing the DVD, the Court cannot agree with counsel's characterization of its contents,[61] and is persuaded that any additional evidence revealed in the January 18 interview was cumulative and not material.[62]

Defense counsel also argued that the recording reveals that Torres was "coached" by Arlington detectives, who told her "it would go better for her if she implicated Mr. Battles" in the conspiracy.[63] Counsel also suggested that recording stopped when Torres failed to implicate

---

[59] Hr'g Tr. 4/20/11 at 20. The phone records did not show any calls between numbers associated with Torres and numbers associated with Booker; all of the calls were between Battles and Torres or Battles and Booker.

[60] Hr'g Tr. 4/20/11 at 19-20.

[61] Counsel may have confused the interviews during the hearing. In the January 22 interview, Torres told the police that she knew how to access by computer Battles's bank account with Bank of America. Regardless of when Torres made this statement, the Court finds that it did not open new avenues of impeachment.

[62] Walker, 657 F.3d at 186 (holding that "impeachment evidence, if cumulative of similar impeachment evidence used at trial . . . is superfluous and therefore has little, if any, probative value" (ellipses in Walker; internal quotation omitted)).

[63] Hr'g Tr. 4/20/11 at 19.

13

Battles sufficiently, and that Torres may have been offered further incentives off the record.  This is conjecture.  The Court has reviewed the DVD and although it ended abruptly, its content does not indicate that the police either coached Torres or offered her incentives to implicate Battles.  Moreover, Torres's incentives to testify were explored at trial:  Torres testified on direct examination at trial that she was a witness for the prosecution pursuant to a plea agreement, and that she hoped to receive a more lenient sentence in exchange for her testimony.  Therefore, even if the Court accepted counsel's interpretation of the interview, it adds no new information to significantly challenge Torres's credibility in light of the summaries of the other interviews that were provided to defense counsel before trial.

### C.  The January 22, 2008 interview DVD was not material

The Court finds that the summary produced before trial fairly and accurately represented the contents of the third interview with regard to evidence that could be used to challenge Torres's credibility.  Defense counsel argued that the DVD raised questions as to whether Torres had conspired with her sister, and whether Torres's sister influenced her testimony.[64]  During the January 22 interview, Torres consulted a notebook that her sister helped her prepare for purposes of the police interview.[65]  Defense counsel argued that the notebook, and the fact that another envelope found in Torres's home was addressed to her sister, give rise an inference that the checks were not stolen for Battles or that Torres's sister may have been the ultimate recipient of

---

[64] Hr'g Tr. 4/20/11 at 20-22.

[65] Id.

the checks.[66] However, the possible existence of an envelope addressed to Torres's sister was known at trial.[67] This theory also fails to account for how the earlier checks came to be deposited in Philadelphia, rather than in Wisconsin, where Torres's sister apparently lives.[68]

Battles also argued that Torres had used the name Nancy Green as the sender's name on the receipt for an express mail envelope sent to Pennsylvania, and gave conflicting statements regarding the contents of the envelope. The fact that the name Nancy Green was on the receipt had been included in the summary of the January 19 interview, and the summary noted that Torres told police that the name was fictional.[69] Battles therefore had sufficient information before trial to impeach Torres on this issue. Torres's misstatements concerning the contents of the envelope did not open a new avenue of impeachment; they were similar to other misstatements by Torres.

The evidence at trial, including phone and airline records, bank statements, and the testimony of witnesses who had close personal relationships with Battles, all established that the conspiracy comprised Battles, Torres, and Booker. Battles offers only conjecture of the involvement of anyone else. "Such an attenuated and unsupported assertion does not cast doubt on the outcome of the trial and thereby constitute a Brady violation."[70]

---

[66] Id.

[67] During the cross-examination of Torres, there was a sidebar discussion during which trial counsel for Battles raised the question of whether some of the checks found in Torres's home were in an envelope with the name of Torres's sister on it. The AUSA said that he would check whether Special Agent Koerber had the envelope. N.T. 5/4/10 at 50-51. Defense counsel never raised the issue again during the trial.

[68] Hr'g Tr. 11/2/10 at 30.

[69] Exh. G-1 at 7.

[70] Walker, 657 F.3d at 185-86.

## IV. Conclusion

Perhaps because of the different jurisdictions involved, not all of the witness interviews were provided to defense counsel before trial. Although this is regrettable, the Court is persuaded that the failure was not material, that Battles was not prejudiced as a result, and that he received a constitutionally fair trial.[71] It is undisputed that Torres lied to the police, and her inconsistent statements were the subject of both direct testimony and cross-examination. More important, the other evidence at trial, including telephone, bank, and travel records, and the testimony of other witnesses and documentary evidence corroborated the substance of Torres's testimony with regard to Battles's guilty. Battles has not established that the outcome of the trial probably would have been different if the recorded interviews had been produced before trial. Therefore, no Brady violation occurred in this case.[72]

---

[71] Walker, 657 F.3d at 188.

[72] See Kyles v. Whitley, 514 U.S. 419, 434 (1995) (holding that the "touchstone of materiality is a reasonable probability of a different result" (citation omitted)).